## J. S. WINSLOW & CO. v. SUSQUEHANNA COAL CO. et al.

(District Court, D. Maine. December 10, 1912.)

No. 199.

COLLISION (§ 71*)—VESSEL DRAGGING ANCHOR—COLLISION WITH ANCHORED VESSEL.

    The large coal barge Occidental, light, anchored in Boston Harbor during a high wind at night, dragged her anchors, and after some hours drifted against the barge Shamokin, anchored a quarter of a mile to leeward, causing her to also drag her anchor, and the two drifted until they came into collision with a schooner a quarter of a mile further on. *Held*, on the evidence, that the Occidental was in fault for failing to keep

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

a proper anchor watch, it appearing that, if her anchor chains had been paid out to a proper length when she commenced dragging, they would have held her, and that she then had sufficient room to swing. *Held*, further, that under the circumstances the Shamokin did not anchor so near the Occidental as to give her a foul berth, and that neither the Shamokin nor the schooner was in fault.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.*]

In Admiralty. Suit for collision by J. S. Winslow & Co., owners of the schooner Jane Palmer, against the Susquehanna Coal Company, owner of the barge Shamokin, and the Seaboard Transportation Company, owner of the barge Occidental. Decree against the Seaboard Transportation Company.

Benjamin Thompson, of Portland, Me., for libelant.

Burlingham, Montgomery & Beecher, of New York, N. Y., for Susquehanna Coal Co.

Blodgett, Jones & Burnham, of Boston, Mass., for Seaboard Transp. Co.

HALE, District Judge. This libel is brought by the owners of the schooner Jane Palmer to recover damages sustained by that schooner by reason of a collision with the barge Occidental, owned by the Seaboard Transportation Company, and the barge Shamokin, owned by the Susquehanna Coal Company. The Jane Palmer is a five-masted schooner, 325 feet long, 49 feet beam, having a depth of hold of 22 feet. She is of the burden of 3,138 gross tons. At the time of the collision she had on board a cargo of 4,600 tons of coal, and was drawing 29 feet. She arrived in Boston Harbor about 4 o'clock on the afternoon of Tuesday, January 2, 1912, and came to anchor inside of Deer Island Light. She anchored upon the regular anchorage ground where there was abundant sea room all about her. She anchored with her port anchor. This anchor weighed about 4½ tons, and carried from 110 to 120 fathoms of chain. At the time of anchoring there were about 45 fathoms of chain paid out. An hour later 15 fathoms more were paid out. As she lay at anchorage, she had 8 or 9 feet of freeboard amidships. She remained at her anchorage until after the collision.

The Occidental is a barge of 1,424 tons burden, 210 feet in length, 39.9 feet beam. Her draft when loaded is 24.6 feet. When light, as she was at the time in question, her draft was 11.6 feet, and she then had about 24 feet of freeboard amidships, and 26.5 feet at the bow. Having discharged a cargo of coal in Boston on January 4, 1912, she was towed from Mystic wharf by one of the T wharf steam tugs, and then taken in tow by the steam collier William Chisholm, and towed out as far as the Lightship. By reason of the unfavorable weather she was towed back and anchored, about half past 10 in the forenoon, about midway between Deer Island and Governors Island; the place of anchorage being selected by the master of the Chisholm. The barge dropped her starboard anchor. About 35 fathoms of chain were given her. She had in all 120 fathoms on each cable. At the time the Oc-

cidental came to anchor, the steamer Charles F. Mayer and two barges were anchored about a mile to the eastward. The schooner Jane Palmer was anchored off the Occidental's starboard quarter, at least a half mile to the southeast. There were no vessels lying between the Occidental and the Palmer.

The Shamokin is a barge of 829 tons burden, employed in the coastwise business, carrying coal. She is 193 feet long, 32.2 feet beam, 13.7 feet depth of hold. She arrived in Boston Harbor about half past 10 o'clock in the evening of January 4, 1912, in tow of the steam tug Paoli. She then had on board 4,700 empty barrels, and was drawing 5.5 feet, with 9 or 10 feet freeboard. She came to anchor nearly on a line between Governors Island and Deer Island Lighthouse, about half way between the schooner Jane Palmer and the Occidental. Her starboard anchor was dropped, and about 45 fathoms of chain were paid out. When she dropped back on her chain, her captain thought she was about a quarter of a mile from the Jane Palmer, and about the same distance from the Occidental. The starboard anchor weighed 5,100 pounds, and the port anchor 1,650 pounds. The barge had 90 fathoms on her starboard chain, and 65 fathoms on her port chain.

On the following day, Friday, January 5th, owing to weather conditions, none of the vessels left their anchorage. During the latter part of the day the wind, which had been strong from the northwest, increased. During Friday night the Occidental dragged down, so that her stern came in contact with the Shamokin's stem. After she cleared the Shamokin's stem, she lay across the Shamokin's bow for a short time. While the two barges were in that position, both of them started to drag. Very soon the Occidental dropped down along the starboard side of the Shamokin. The two barges were made fast together. They then dragged down towards the Palmer, until between 6 and 7 o'clock in the morning of Saturday, January 6th, when they were about 200 to 300 feet from the Palmer. As the tide began to flood, the Palmer swung to the northward and westward, so that her port side came in contact with the starboard side of the Shamokin. The barges were then lashed to the schooner with their anchors and chains still out to windward. The vessels remained in this position until about 11 o'clock of the same forenoon, when the Palmer began to swing with the ebb tide. The lines between the schooner and barges parted; and, as the barges swung clear, the Shamokin's port quarter and stern did further damage to the schooner.

It is clear, then, that, the barge Occidental having driven upon a vessel at anchor, a prima facie case is made out against her. It is for her to show affirmatively that the drifting was due to some cause other than her own fault. The Lincoln, Fed. Cas. No. 8354; The Louisiana, 3 Wall. 164, 18 L. Ed. 85.

The Occidental contends in argument that the disaster was caused by vis major. This contention is not, however, set up in its answer, nor supported by its proofs. A fresh gale was blowing; but the whole testimony fails to sustain the contention of the Occidental that her dragging was caused by inevitable accident. The whole weight of evidence is to the effect that there was nothing, so far as the wind and sea were

concerned, that would cause vessels to drag, provided they had suit-
able ground tackle, and were properly looked after.   There is some
testimony that on the night in question a fishing schooner dragged;
but none of the large vessels, anchored in this locality, dragged.   The
Jane Palmer rode securely at a single anchor.

The Occidental contends that the injury was occasioned by the
Shamokin coming to anchor in a dangerous proximity to her, thereby
giving her a foul berth.   It is urged that the Occidental did not have
room enough to maneuver in, or to pay out chain sufficient to prevent
dragging; that her dragging did not cause the injury; that she had
plenty more scope of chain which she could have paid out, but was so
close to the Shamokin that it was impossible to pay out more chain
without danger of collision; that, before the collision, she dragged
probably not more than her length; that such dragging was almost im-
perceptible; that, when her captain let go her second anchor at six
o'clock in the evening, he paid out chain as the wind increased, and
as he found it necessary, to overcome the tendency to drag; but that
this paying out of the chain brought him nearer and nearer to the
Shamokin; that it was the part of prudence, under the circumstances,
for him to pay out only so much chain as was from time to time de-
manded; that with the Shamokin so near he had to exercise great
care in paying out his chain.   It is urged that the Shamokin had at
the time the two barges came together five fathoms of chain left which
she had not paid out; and that, if she had paid out this remaining
chain, the Occidental could have paid out five fathoms more of her
chain, and that this would have been sufficient to prevent the two barges
from coming together.   With reference to the seamanship of the Oc-
cidental, it appears from testimony in her behalf that on the night of
the injury the captain anticipated giving his vessel a second anchor.
After 6 o'clock in the evening it breezed up, and continued to breeze
up until the two barges came together.   At 6:15 he dropped his port
anchor, and paid out 15 fathoms of chain, and slacked out 15 fathoms
more on the starboard chain.   At 10 o'clock in the evening he gave her
15 fathoms more on each chain; and, as the wind increased after mid-
night, he gave her 15 fathoms more on each chain.   At the time he
fouled the Shamokin he had 45 fathoms on the port anchor, and about
80 fathoms on the starboard.   He says that he was not on deck all the
time during the night, but was "in and out."   Up to 12 o'clock a deck
hand, Smato, was the only man acting as anchor watch; and he was
in and out of the pilot house.   At midnight he was relieved by Chius.
The testimony of Chius is not such as to satisfy the court that he was
of much value in that position.   Although an old man, Capt. Smith was
apparently the only man on board, other than the steward, with ex-
perience sufficient to be of value as an anchor watch; and he was on
deck only a portion of the time during the latter part of the night
when his vessel dragged.   The Occidental was high out of water; and
with the gale increasing it was imperative that great care should be
exercised in keeping a proper anchor watch, to look out for her; for
the danger was apparent that, if she dragged, she would come near
the Shamokin, and this danger was all the greater if she was so near

the other barge as the testimony in her behalf places her. The evidence shows that her ground tackle was sufficient, if she had been properly watched, and if sufficient scope of chain had been paid out at the proper time. It seems clear that a competent anchor watch would have promptly discovered that the barge was dragging, and would have thus enabled those in charge to give sufficient scope to her chains to check her dragging before she reached the Shamokin. The failure to have a competent watch was the chief cause of her dragging down upon the Shamokin. By such dragging down she fouled the Shamokin, and broke out her anchors. Her port chain fouled the Shamokin's port anchor in such a way as to lessen the holding power of the ground tackle. I cannot sustain the contention that the injury was caused by reason of the Shamokin having anchored too near the Occidental. The distance between the two barges must have been about a quarter of a mile. The Occidental, then, could have paid out the whole of her 120 fathoms of chain, and yet kept clear of the Shamokin, even though the Shamokin did not pay out any chain. And the proofs lead me to believe that the Shamokin was also paying out chain; so that the Occidental must have dragged more than 720 feet. In order to do this, she must have been dragging, without anybody on the barge having knowledge of it. If there had been a proper anchor watch, who seasonably observed that she did not have sufficient scope of chain, she could have readily paid out at least 25 fathoms more chain without endangering the barge, or getting into close quarters with the Shamokin. After the two barges were lashed together, their further dragging could have been prevented by giving more scope to the chains of the Occidental. This was a reasonable precaution to adopt. And, as the barges were then a quarter of a mile from the schooner, there was time for her to adopt this precaution. I am of the opinion that the Occidental has not met the burden of showing that the collision between the two barges is accounted for by the fact that the Shamokin anchored so near the Occidental that, in paying out chain, the Occidental was set down upon the Shamokin. After the Occidental fouled the other barge, those in charge of the Occidental were in fault still further, in that they did not promptly pay out sufficient chain to prevent the barges dragging into the locality where the flood tide would necessarily set the Palmer.

The Occidental charges the Shamokin with the initial negligence in the case, in that she anchored so close to the Occidental as to give her a foul berth, and prevented her from paying out sufficient chain to hold her. In considering the alleged fault of the Shamokin, I may find it convenient to restate some of the proofs to which I have adverted in passing upon the fault of the Occidental. When the Shamokin anchored on Thursday night, January 4th, she found the Occidental and the schooner already at anchor. The testimony leads me to believe that they were lying rather more than a half a mile apart, that the Shamokin anchored at a point half way between the barge and the schooner, so that she was not far from a quarter of a mile distant from each vessel. In The Lincoln, Fed. Cas. No. 8,354, Judge John Lowell referred to the case of The Volcano, 2 W. Rob. Adm.

337, in which Dr. Lushington, with the advice of the Trinity Masters, pronounced a steamer to be negligently moored when she had taken her berth at two cable lengths, or 240 fathoms to the windward of the injured vessel. He refers to another case in which the Trinity Masters pronounced it bad seamanship to anchor so near another vessel, directly ahead or directly astern, that in case of striking adrift there would not be room to bring up and sheer the drifting ship, without danger of collision. Judge Lowell also cites The Julia M. Hallock, Fed. Cas. No. 7,579, in which Judge Sprague held that 125 fathoms to leeward was ample distance under the circumstances, and upon the nautical testimony of the case. Each case must be decided upon its own circumstances, and upon the nautical conditions prevailing. Under the conditions in this case, I cannot hold that the Shamokin anchored so near the other barge as to give her a foul berth. Upon an examination of the proofs, if we assume that the Occidental paid out all the chain which she claims to have paid out, it is clear that there still must have been some distance left between the two barges, and that it was the dragging of the Occidental's anchors which brought the two barges together. It is undisputed testimony that the Shamokin was paying out her chain while the other barge was drifting down upon her. Until at the time of their coming together, there were only 5 fathoms left on her starboard anchor, which carried 90 fathoms. I am satisfied that the Shamokin had dropped back nearly as far on her chains as the Occidental had dropped back on her chains. I have tried to give full weight to all the proofs in the case upon this point, and I do not find that there was any maneuver which the Shamokin could have made which would have prevented the two barges coming together. The testimony on her part is that her captain and steward were on deck, and that they did all that could be done. I find nothing in any of the proofs, or in the circumstances of the case, to controvert this contention of the Shamokin. The fact that, after the two barges came together, they both dragged, does not impute fault to the Shamokin. It is not strange that the anchors of the Shamokin were unable to hold her with the Occidental lying across her stern. I find that the Shamokin is not chargeable with any fault which contributed to the collision with the schooner.

On the part of the Occidental, it is also urged that the schooner Jane Palmer was herself at fault, and that by proper seamanship she might have avoided the injury. It is urged that she could have been moved by the use of her head sails out of the way of the barges, and thus could have escaped injury, in view of the fact that she had abundance of time to maneuver, while the two barges were gradually coming down upon her in almost a straight course from 2 o'clock to 7 o'clock on Saturday morning. The Occidental offered some testimony tending to show that it was practicable for those in charge of the Palmer to heave in on her port chain a sufficient amount to break her anchor out and enable her to drag down far enough to carry her completely out of the path of the barges, and that then, by paying out her chain, they could have readily picked her up again, and that this was a feasible and practicable maneuver, that it could have read-

ily been accomplished, even with her one anchor out, but that it is also true that she had a second anchor which could have been used, if it had been necessary, in order to hold her after she had dragged out of the way of the barges. On the part of the schooner, the mate testifies that, "if he had hove the schooner ahead her length or more, it would not have cleared the barges." He says, too, that it would have been pretty dangerous "to heave ahead the length of the vessel and drop another anchor while it was blowing a living gale." It requires very little testimony to convince me that to shorten up her chain in a gale of wind, under the circumstances in which the Jane Palmer was placed, would have been a maneuver involving great danger. I do not think it necessary to discuss in detail all the expedients which the Occidental now advances as proper maneuvers for the Jane Palmer to adopt while the barges were drifting down upon her in order to escape the threatening danger. No one of the theories now offered in behalf of the Occidental was suggested by her master, or by the master of the Shamokin, at the time of the injury. I do not see how any maneuver which would have stood the test of practical seamanship could have safely been made by the schooner. The testimony leads me to believe that she was competently manned, that she maintained a diligent watch throughout the night in question, and that everything was done by her which could reasonably have been done to avoid injury. I am of the opinion that the schooner was free from fault.

Let a decree be entered for the libelant against the Seaboard Transportation Company, with costs. Fritz H. Jordan may be appointed assessor. The libel against the Susquehanna Coal Company is dismissed, with costs.