STRATTON GROCERY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 7645. Promulgated September 27, 1927.

1. Under the evidence, *held* that no profit was realized by petitioner on sale of its good will in 1919.

2. Value of good will disallowed in computation of invested capital, under section 331, Revenue Act of 1918.

*M. M. Ashbaugh, Esq.,* and *Edward S. Elliott, C. P. A.,* for the petitioner.

*C. H. Curl, Esq.,* for the respondent.

This is a proceeding for the redetermination of a deficiency in income and profits taxes for the year 1919 in the amount of $25,291.08. This deficiency results in part from the action of the Commissioner in adding to the reported income of petitioner the sum of $50,000 as profit on the sale of good will, and in reducing the invested capital of the petitioner, as reported in its return, by disallowing the sum of $50,000, representing the value of certain good will acquired from its predecessor. The correctness of the Commissioner's action, in respect of the two items mentioned, constitutes the sole controversy involved herein.

FINDINGS OF FACT.

Petitioner is a Tennessee corporation, with its principal office at Memphis. It was organized in June, 1918, under the name of Saunders-Stratton Grocery Co., with an authorized capital stock of $500,000, and shortly thereafter the name was changed to Stratton Grocery Co.

Prior to the organization of petitioner, the L. M. Stratton Co., a corporation, was engaged in the jobbing business in Memphis, dealing in food products. The business was first established as a partnership by L. M. Stratton and R. D. Warren in 1904, with a capital of $100. It was incorporated as the L. M. Stratton Co. in February, 1908, and in 1909 had a capital stock of $50,000, one-half of which was owned by L. M. Stratton. After its incorporation, L. M. Stratton was president of this company.

Prior to the organization of petitioner, there was also another corporation in Memphis known as the Saunders-Blackburn Grocery Co., which was engaged in the business of selling groceries at wholesale on the mail-order plan, and was owner of the Piggly Wiggly stores in that city. Clarence Saunders was president of the last-named corporation, and owned a controlling interest in it. Saunders

personally originated the Piggly Wiggly system of merchandising and obtained patents and trade-marks covering its operation. He then sold franchise rights to others in different parts of the country to operate stores on this plan. Later, he organized a Tennessee corporation known as Piggly Wiggly, Inc., and transferred to it the right to operate stores under the Piggly Wiggly system. The capital stock of Piggly Wiggly, Inc., was owned by the Saunders-Blackburn Grocery Co.

Prior to June, 1918, Stratton had become associated with Saunders and was assisting him in the development of the Piggly Wiggly idea, with a view to its expansion into a national system of retail chain grocery stores.

Stratton and Saunders, desiring to consolidate their interests and respective companies, entered into a contract on June 15, 1918, providing for the organization of the Saunders-Stratton Grocery Co. The new corporation was to take over the assets of the L. M. Stratton Co. and the Saunders-Blackburn Grocery Co., issue its stock for the net worth of each, and, in addition thereto, issue stock in the amount of $50,000 par value to the stockholders of each of said companies in exchange for their good will and franchise rights. This contract was duly carried out according to its terms, and petitioner thus acquired, in addition to other assets, the good will of the L. M. Stratton Co. at a cost of $50,000 par value of stock, and the good will and Piggly Wiggley franchise of the Saunders-Blackburn Grocery Co. at a like cost of $50,000 par value of stock. The total amount of $100,000 was thereafter set up on the books of petitioner as " Good will and Piggly Wiggly franchise." At the time of its organization, more than 50 per cent of the capital stock of petitioner was acquired by and issued to the stockholders of the L. M. Stratton Co. The contract which resulted in the organization of petitioner, after providing for issue of its stock in payment for the assets of the two consolidated companies, provided:

It is further understood that the Treasury stock remaining is to be sold at par by the Officers who may be elected by the Saunders-Stratton Grocery Company.

It was expected that approximately $200,000 of the stock of the new company would be issued to the stockholders of the L. M. Stratton Co. for its assets, and that approximately $150,000 of stock would be issued to the stockholders of the Saunders-Blackburn Grocery Co. for its assets, and that the balance of the stock of the authorized issue of $500,000, would be sold at par to others. However, when the inventory was taken, it was found that the tangible assets of the Saunders-Blackburn Co. amounted only to $31,500, and it became necessary to sell the remaining stock in order to provide working capital for petitioner. It was found to be impracticable to sell

the stock to outsiders on account of the restrictions imposed by the Capital Issues Committee during the war period. Because of these facts the stock was taken by the stockholders of the L. M. Stratton Co. thereby increasing the amount of petitioner's stock acquired by them to more than 50 per cent of the total authorized issue. In 1919, after removal of the war-time restrictions on the transfer of stock, the former stockholders of the L. M. Stratton Co. reduced their holdings of petitioner's stock below 50 per cent.

At the time of the sale of its assets to the Saunders-Stratton Grocery Co., the L. M. Stratton Co. had a capital stock of $100,000, of which L. M. Stratton owned $37,500.

After the consolidation of their companies, Stratton and Saunders were in frequent conference with regard to the future development of the Piggly Wiggly system, and on November 10, 1919, made a verbal agreement for the sale of the assets of the Stratton Grocery Co., petitioner herein, to a new corporation, to be organized under the name of Piggly Wiggly Stores, Inc. In this transaction, Stratton, who owned 691 of the 5,000 shares of the capital stock of petitioner corporation and who was its president, represented petitioner, and Saunders represented the proposed new corporation. Saunders did not at that time own any of petitioner's stock. The verbal agreement reached on November 10, 1919, between Stratton and Saunders was made subject to ratification by the stockholders of petitioner, was subsequently reduced to writing, duly ratified, and the written contract was thereafter executed under date of November 29, 1919. Piggly Wiggly Stores, Inc., was organized on November 18, 1919, as a Virginia corporation. The written contract referred to ex·pressly provided for the sale by petitioner to the Piggly Wiggly Stores, Inc., of the following assets:

(1) All of the salable merchandise contained in stores then operated by petitioner in Memphis under the Piggly Wiggly system, in accordance with inventory to be taken on December 26, 1919; (2) all store fixtures used in said Piggly Wiggly stores; (3) contract with Piggly Wiggly corporation for right to operate stores under the Piggly Wiggly system, " the contract to be transferred upon the valuation of $100,000;" (4) all leases for store buildings then occupied by stores operated under the Piggly Wiggly system; (5) salable merchandise and warehouse and delivery equipment located in the wholesale warehouse used by petitioner, to the amount of $390,-000 according to inventory as of January 1, 1920; (6) all issued and outstanding stock of the Madison Bread Co. of the par value of $15,000, together with the lease of the premises occupied by that company; and (7) lease on the warehouse occupied by petitioner under a 10-year rental contract. The said assets were to be paid for in cash and with stock of the Piggly Wiggly Stores, Inc.

Pursuant to the contract of November 29, 1919, petitioner transferred and delivered on December 26, 1919, and January 2, 1920, to the Piggly Wiggly Stores, Inc., substantially all of its stock of merchandise, delivery equipment, leases, good will, franchise rights, and also its organization of employees, consisting of approximately 100 men, with a few minor exceptions. Petitioner retained its accounts receivable, cash on hand, Liberty bonds, a small amount of merchandise purchased but not paid for, and one or two trucks, which, together with the proceeds from the sale of its other assets to Piggly Wiggly Stores, Inc., comprised a total value of approximately $600,000. After the sale and transfer of its assets to the Piggly Wiggly Stores, Inc., petitioner had no facilities remaining with which to carry on business.

The verbal agreement of November 10, 1919, between Stratton and Saunders was reached in the City of Washington. Shortly thereafter Stratton returned to Memphis and reported to his brother, A. C. Stratton, vice president of petitioner, and to his other associates in the company, the matter of the proposed sale of petitioner's assets to the new corporation. A. C. Stratton did not desire to become a part of the organization of the new corporation, and on or about November 20, 1919, instituted negotiations looking to the consolidation or merger of petitioner (to be effected after transfer of its business and assets to the Piggly Wiggly Stores, Inc.) with the W. C. Early Co., another wholesale grocery corporation then operating in the City of Memphis. As the result of such negotiations, L. M. Stratton, representing the Stratton Grocery Co., and W. C. Early and L. Y. Williamson, representing the W. C. Early Co., entered into a written contract under date of November 25, 1919, providing for a consolidation of the two companies as of December 31, 1919. Under the terms of this contract it was agreed, among other things, that the Stratton Grocery Co. would as soon as possible amend its charter so as to change its name to Early-Stratton Co., and increase its authorized capital stock from $500,000 to $1,000,000. It was further agreed that the Stratton Grocery Co. would purchase the merchandise, fixtures and leases of the W. C. Early Co. " on cost and market bases " to be determined by inventory, and would pay to the last named company $50,000 for its good will. This contract was carried out, and W. C. Early became chairman of the board of directors of the Early-Stratton Co., L. M. Stratton became president, and A. C. Stratton became vice president and general manager.

The W. C. Early Co., prior to its merger with petitioner, had conducted a business materially different from that of petitioner and had an entirely different clientele. It operated a wholesale grocery business on long-time credit, and used traveling salesmen to secure

orders. It had acquired the exclusive sale of a large number of popular brands and had a business established on these brands. It also handled a line of feeds, hay, and grain. After the merger, A. C. Stratton, as vice president and general manager, had active management of the Early-Stratton Co., while L. M. Stratton, who had been elected vice president of the Piggly Wiggly Stores, Inc., was actively engaged in the development of that business from its organization up to July 20, 1920, when he resigned. He did not maintain a desk in the office of the Early-Stratton Co. for more than a year after it was organized. The Early-Stratton Co. continued the business which had formerly been operated by the W. C. Early Co. for approximately 27 years, using its books and accounts, and substantially the same organization, equipment, and methods. It also continued the business in the office and warehouse formerly occupied by the W. C. Early Co.

The Stratton Grocery Co., prior to the sale of its assets to the Piggly Wiggly Stores, Inc., had operated a wholesale and retail grocery business on the mail-order plan, selling for cash. Its principal customers were the Piggly Wiggly Stores, which it owned.

Petitioner sold, transferred, and delivered to the Piggly Wiggly Stores, Inc., for a consideration of $100,000, the good will which it had theretofore acquired by purchase from the L. M. Stratton Co. for $50,000 and the good will and Piggly Wiggly franchise, which it had theretofore acquired from the Saunders-Blackburn Grocery Co. for $50,000.

OPINION.

TRAMMELL: The controversy in this proceeding raises two issues: (1) Did petitioner realize a profit of $50,000 on the sale of its intangible assets in November, 1919, and (2) is petitioner, under the provisions of the Revenue Act of 1918, entitled to have the good will acquired by it from the L. M. Stratton Co. included in the computation of its invested capital at a valuation of $50,000?

With respect to the first issue, petitioner contends that, notwithstanding the formal provisions of the written contract of November 29, 1919, it was intended thereby that it should sell, and that it did in fact sell, to the Piggly Wiggly Stores, Inc., for a consideration of $100,000, the good will acquired by it from the L. M. Stratton Co. at a cost of $50,000, and the good will and Piggly Wiggly franchise acquired from the Saunders-Blackburn Grocery Co. at a like cost of $50,000, and that hence no profit was made on this transaction. Respondent contends that, under the express provisions of the written contract, petitioner sold to the vendee corporation for $100,000, the Piggly Wiggly contract or franchise only, which it had theretofore

acquired at a cost of $50,000, and retained its good will, thus realizing a profit of $50,000, which amount respondent added to the reported income of petitioner.

Petitioner issued its stock of the par value of $50,000 to each of its two predecessor corporations, or stock of a total par value of $100,000, for the good will acquired by it. No controversy is raised with respect to the value of the stock. At the hearing, respondent specifically admitted that petitioner paid $100,000 for its good will, and thus in effect that the stock was worth par.

It being uncontroverted that petitioner acquired at a cost of $100,000 the good will of its predecessor corporations, together with the Piggly Wiggly franchise, under the circumstances set out in our findings of fact, it remains to be determined whether petitioner sold its combined good will and the Piggly Wiggly franchise for $100,000, or whether it retained the good will and sold only the franchise.

At the hearing, after introducing in evidence the written contract, petitioner offered oral testimony in support of its contention. Thereupon, respondent objected to the admission of such testimony on the grounds that the contract was free from any ambiguity and should speak for itself, and that its terms could not be modified, changed or explained by parol evidence. We have heretofore had occasion to consider this question, and have held that such evidence as between the Government and one of the parties to the contract is competent and admissible. *Appeal of Converse & Co.*, 1 B. T. A. 742; *Appeal of Arthur B. Grover*, 3 B. T. A. 508.

L. M. Stratton, who was then president of petitioner and on its behalf signed the contract in question, testified as follows:

Q. Mr. Stratton, what was the intention of the parties to this contract as to the transfer of the good will of the Stratton Grocery Co. to the Piggly Wiggly Stores, Inc.?

A. It was to transfer at the same price at which it was acquired, from the L. M. Stratton Co. and the Saunders-Blackburn Grocery Co. the item of good will and franchise rights we had on our books to the Piggly Wiggly Stores, Inc.

\*        \*        \*        \*        \*        \*        \*

Q. Was the amount of $100,000 referred to in paragraph 3 of the contract the same amount as was paid by the Stratton Grocery Co. for the good will of the L. M. Stratton Co. and the Saunders-Blackburn Grocery Co.?

A. It was.

Q. Was it intended that that amount of $100,000 should cover exactly the same good will as was previously acquired in that way?

A. It was.

Without regarding this testimony as conclusive, we find, upon further examination of the evidence, corroborative facts which irresistibly lead to the same result. The Supreme Court of the United States has laid down the proposition that good will is inseparable

from the business in connection with which it was created. In *Metropolitan Bank* v. *St. Louis Dispatch Co.*, 149 U. S. 436–451, Mr. Chief Justice Fuller, speaking for the court, at page 446, said:

Undoubtedly, good will is in many cases a valuable thing, although there is difficulty in deciding accurately what is included in the term. It is tangible only as an incident, as connected with a going concern or business having locality or name, and is not susceptible of being disposed of independently.

Again in the case of *Sawilowsky* v. *Brown*, 288 Fed. 533, the Circuit Court of Appeals, Fifth Circuit, said:

Good will and trade-names or trade-marks connected with a business are destroyed by a sale of the business without the good will and trade-marks * * *.

To the same effect also *In re Jaysee Corset Co.*, 201 Fed. 779.

The undisputed evidence shows that petitioner sold, transferred and delivered to the Piggly Wiggly Stores, Inc., its stock of merchandise, its delivery equipment, retail stores, fixtures, and the lease on its business premises. It also transferred to the vendee practically its entire organization of employees, including its president, who had been largely instrumental in building up its good will. Thus, having divested itself of the means of carrying on its business, it ceased to be a going concern, to which good will could attach. Having sold and transferred its business, to which the good will was inseparably attached, it follows that the good will went with it, whether or not such good will was specifically included in the purchase price. It is immaterial that petitioner later changed its name, acquired the business of another going concern having an entirely different clientele, and thereafter operated such business at a new and different location.

But it is contended by the respondent that even though petitioner intended and attempted to sell its good will to the Piggly Wiggly Stores, Inc., it nevertheless retained its good will by reason of the fact that it acquired the assets of the W. C. Early Co. and thereafter operated a somewhat similar business at a different location.

The facts show that on November 10, 1919, when L. M. Stratton and Saunders reached their verbal agreement in Washington for the sale of petitioner's assets to the new Piggly Wiggly Corporation, the negotiations for the purchase of the Early Company had not been started, nor were they in contemplation. Upon the return of L. M. Stratton to Memphis and after he had informed his brother, A. C. Stratton, of the proposed sale of petitioner's assets, the latter, some days thereafter, instituted the negotiations which led to the contract between petitioner and the W. C. Early Co. While it is true that this contract was actually signed four days prior to the date on which the written contract was signed for the sale of petitioner's assets to the Piggly Wiggly Corporation, it was the intention

of the parties that the contract with the Early Company should not be carried out until after the completion of the transfer of petitioner's business to its vendee. The money to be paid by petitioner for the Early assets was to come from the proceeds of the sale of its business to the Piggly Wiggly Corporation. After the transaction had been completed, petitioner possessed substantially only liquid assets, consisting principally of stocks, bonds, and money in bank, of the total value of about $600,000. These assets were then used by petitioner to carry out its obligations under the Early contract. At that time, petitioner had divested itself of all the facilities of a going concern, and with the exception of the assets received from the sale of its business, retained only its corporate franchise. With the assets of the principal part of which it received from the sale of its business, it acquired another business. An appreciable time intervened during which petitioner was not a going concern in the sense that it possessed a business to which good will could attach. It was no longer operating the business in connection with which its good will had been created. That business, as a going concern, consisting of a plant, equipment, fixtures, stock of merchandise, an established location, a large force of trained employees, and the good will which attached to all these elements as a whole, was then owned, in the possession of, and being operated by the Piggly Wiggly Stores, Inc.

In *Washburn* v. *National Wall Paper Co.*, 81 Fed. 17, 20, the court said:

> If good will be a "parasite," it is a "parasite" of the business from which it sprung, not of the mere machinery by which that business was conducted.

In the light of all the facts and circumstances disclosed by the evidence, we are satisfied that it was the intention of the parties that petitioner should sell and that Piggly Wiggly Stores, Inc., should purchase, at a valuation of $100,000, the same intangible assets which petitioner had theretofore acquired at a like cost. Accordingly, no profit was realized by petitioner, and respondent erred in adding the sum of $50,000 to petitioner's income for the taxable year involved herein.

The material facts respecting the second issue are admitted. Petitioner acquired the good will of the L. M. Stratton Co. subsequent to March 3, 1917, to wit, in 1919. It paid $50,000 par value of stock for such good will. At the time of organization, the stockholders of the L. M. Stratton Co. acquired, and for some time thereafter retained, more than 50 per cent of petitioner's stock. Thus, an interest or control in the good will, amounting to more than 50 per cent, remained in the same persons. The provisions of the Revenue Act of

1918, applicable to these facts, are contained in section 331, the pertinent part of which reads as follows:

Sec. 331. In the case of the reorganization, consolidation, or change of ownership of a trade or business, or change of ownership of property, after March 3, 1917, if an interest or control in such trade or business or property of 50 per centum or more remains in the same persons, or any of them, then no asset transferred or received from the previous owner shall, for the purpose of determining invested capital, be allowed a greater value than would have been allowed under this title in computing the invested capital of such previous owner if such asset had not been so transferred or received; * * *

Petitioner in its brief states that while it can not be denied that the stockholders of the L. M. Stratton Co. did acquire more than a 50 per cent control in its stock, such acquisition resulted from the regulations imposed by the Capital Issues Committee, a Governmental agency, and placed it in a position whereby it is being made to suffer at the hands of another branch of the Government. Petitioner then argues that such a situation was never intended in the administration or enforcement of any Federal law, and suggests that this Board has ample power and discretion to correct such a condition.

With this contention we are unable to agree. We find in the Revenue Act of 1918, no exception to the provisions of section 331, and we can not read into the law an exception not by express provision or fair implication contained therein. The facts hereinabove set out come squarely within the purview of section 331. It follows, therefore, that in determining the invested capital of petitioner for the year 1919, the good will which was transferred to it by and which it received from the L. M. Stratton Co. can not be allowed a greater value than would have been allowed the former owner, if such asset had not been so transferred.

There is no evidence before us to show what value, if any, would have been allowable under said Revenue Act in computing the invested capital of the previous owner of said asset, if it had not been transferred to petitioner. Accordingly, we must approve the action of respondent in respect of this item.

Reviewed by the Board.

*Judgment will be entered on 15 days' notice, under Rule 50.*