Charlotte Corporation, et al. [1] v. Commissioner. Charlotte Corp. v. Commissioner
Docket Nos. 52608, 68666-68670.
United States Tax Court
T.C. Memo 1960-97; 1960 Tax Ct. Memo LEXIS 194; 19 T.C.M. (CCH) 513; T.C.M. (RIA) 60097; May 13, 1960
*194 1. Charlotte manufactured upholstered furniture, and Lycoming manufactured furniture frames for Charlotte. Both firms were operated as one integrated unit, and as such sold out to Chesterfield. Held, Chesterfield purchased all of the assets of Charlotte and Lycoming, including Charlotte's good will; the total purchase price equaled the fair market value of said assets; and the fair market value of Charlotte's good will determined. 2. Subsequently, Chesterfield sold its machinery and equipment, and the cash proceeds of this sale were distributed to its stockholders in a complete liquidation. Held, the stockholders of Chesterfield, who are petitioners herein, are liable as transferees for the tax liability of Chesterfield to the extent of the cash proceeds they received in complete liquidation of that company. Norman Sinrich, Esq., Jay O. Kramer, Esq., and Richard C. Flesch, Esq., for the petitioner in Docket No. 52608. Aaron Lewittes, Esq., for the petitioners in Docket Nos. 68666, 68667, 68668, 68669, 68670. Henry L. Glenn, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency in the Federal income tax *195 of Charlotte Corporation for the year 1950 in the amount of $31,485.24 by characterizing $100,000 (reported as long-term capital gain from the sale of good will) as ordinary income from the sale of inventories. On the inconsistent ground that part of the purchase price was in payment for good will, respondent has determined deficiencies in the income tax of the ultimate buyer, Chesterfield Furniture Manufacturing Corporation, and seeks to hold some of its stockholders [2] liable as transferees of this corporation's assets, in the following amounts: Stockholder
Amount
David Lewittes
$10,472.47
Charlotte Lewittes
10,472.47
Morris Lewittes
10,472.47
Fannie Lewittes
10,472.47
Joseph V. Meister
2,618.13 [3] The above-listed stockholders are hereinafter referred to as the individual petitioners. The principal issue is whether any good will was bought and sold in the above transaction, and if so, the amount of the total purchase *196 price properly allocable to such good will. The other issue for our decision is whether the individual petitioners, who were stockholders of the purchasing corporation, are liable as transferees for the tax liability of that corporation. Findings of Fact Charlotte Corporation, hereinafter referred to as Charlotte, was organized in 1937 under the laws of the Commonwealth of Pennsylvania. Charlotte based its books and records and its Federal income tax return on an accrual method of accounting and the calendar year. It filed its return for the year 1950 with the collector of internal revenue at Scranton, Pennsylvania. Returns for the individual petitioners were all filed with the collector of internal revenue for the third district of New York. From its inception in 1937 through October 12, 1950, Charlotte, under its original name of Chesterfield Furniture Shops, Inc., engaged in the business of manufacturing and selling upholstered furniture under the trade name "Chesterfield Furniture." [4] Nathan Greenberg was the only executive and driving force behind Charlotte. He performed all managerial functions, created all the designs of the furniture, bought all material and sold all of Charlotte's *197 merchandise, except for one part-time salesman. Charlotte was located in Williamsport, Pennsylvania, and its only showroom was at the plant. Buyers usually came there or phoned in their orders. Charlotte had an experienced work force, adequate labor supply, and had worked on an overtime basis for a number of years. During the years 1948, 1949 and until October 12, 1950, at least 90 per cent of Charlotte's output of upholstered furniture was sold to eight large department stores, i.e., Strawbridge & Clotheir in Philadelphia, Joseph Horn in Pittsburgh, Lazarus in Columbus, Ohio, Boston Store in Milwaukee, Abraham & Straus in Brooklyn, Hecht Co. in Washington, D.C., Dayton Company in Indianapolis, and toward the end of that period, to Gimbel Brothers in Milwaukee. Strawbridge & Clotheir and Joseph Horn purchased nearly half of Charlotte's total output. Charlotte usually sold to only one store in a given city, because the stores preferred to handle a trade name exclusively for competitive reasons. Although Charlotte *198 never advertised, some of the above retailers did, and promoted Charlotte's products under the trade name "Chesterfield." Charlotte's books and records reflect the following information: Year
Sales
Cost of Sales
Gross
Percentage
1940
$531,275.73
$411,519.31
$119,756.42
22.54
1941
658,604.49
507,882.01
150,722.48
22.89
1942
582,417.74
408,674.80
173,742.94
29.83
1943
424,296.35
286,223.42
138,072.93
32.54
1944
528,108.56
371,555.14
156,553.42
29.64
1945
497,367.97
346,880.82
150,487.15
30.26
1946
680,104.61
497,650.47
182,454.14
26.83
1947
555,303.51
436,988.15
118,315.36
21.31
1948
626,015.54
494,971.76
131,043.78
20.93
1949
745,535.82
581,831.10
163,704.72
21.96
1950
646,732.94 [5]
Charlotte's net worth and yearly net income for 1946 through 1950 as shown on its Federal income tax returns are as follows: [6]
Net Worth at Jan. 1
Yearly Net Income
Year
Amount
Year
Amount
1946
$ 63,300.02
1946
$47,122.63
1947
110,143.94
1947
7,851.53
1948
115,640.09
1948
11,909.31
1949
126,550.49
1949
20,389.73
1950
146,588.32
1950
30,045.95
The above figures are based *199 on ending inventory valuations determined by Greenberg and handed to Charlotte's certified public accountant who merely accepted them as a correct representation of the value of the ending inventory at the lower of cost or market, without any verification. The inventory values as reflected in Charlotte's Federal income tax returns are as follows: Year Ending
Dec. 31
Amount
1945
$28,005.62
1946
77,842.25
1947
68,903.19
1948
48,300.23
1949
63,210.74
The Lycoming Char Company, hereinafter referred to as Lycoming, commenced business in 1942 or 1943, and its owner at the time of sale was Nettie Greenberg, wife of Nathan Greenberg. Lycoming produced frames for upholstered furniture and all its sales were made to Charlotte, which purchased frames only from Lycoming. Nathan Greenberg ran Lycoming as an integrated part of Charlotte, and it was located on the same premises. The following figures represent the yearly profit or loss of Lycoming as shown on the Federal income tax returns of its owner, Nettie Greenberg: Year
Amount
1946
$ 352.43 (Profit)
1947
4,801.03 (Loss)
1948
1,668.77 (Loss)
1949
1,692.30 (Loss)
1950
Unknown The January 1, 1950, inventory of Lycoming was recorded on its books at $16,336.75, and its *200 liabilities exceeded its assets. After a chance meeting between Nathan Greenberg and David Lewittes, Charlotte and Lycoming, acting as one unit, through Nathan Greenberg, entered into negotiations with David Lewittes for the sale of all their assets. Nathan Greenberg is sometimes hereinafter referred to as the seller, and David Lewittes as the buyer. After the buyer and seller had discussed possible terms of sale, the buyer's attorney prepared a sales agreement, pertinent parts of which are set forth below: "AGREEMENT "Made in the City and State of New York, on September -, 1950, between CHESTERFIELD FURNITURE SHOPS INC. , NATHAN GREENBERG, and NETTIE GREENBERG d/b/a LYCOMING CHAIR CO., of Williamsport, Pa., jointly and severally (herein called the 'Sellers'), and DAVID LEWITTES, of Mt. Vernon, New York (herein called the 'Buyer'), "WHEREIN IT IS MUTUALLY AGREED, AS FOLLOWS: "1. That the Sellers shall, on October 12, 1950, at their own cost and expense, sell and deliver to the Buyer, free and clear of all liens and encumbrances: "(a) All the raw materials, work in process, and finished inventory, used or designed to be used in the manufacture and sale of frames and furniture that *201 are at the plant, located at 201 Pine Street and Front Street, Williamsport, Pa., before the start of business on October 12, 1950; "(b) The machinery, tools, implements, appliances, trade fixtures, and other articles set forth in Schedule 'A' attached hereto; "(c) The good-will of the frame and furniture business located at said plant; "(d) The exclusive right to all the trade-marks, labels and trade secrets used and owned in connection with the said frame and furniture business, including the use of the name 'Chesterfield'; "(e) All pay roll, social security, cost, manufacturing and other records pertinent to the operation of the said frame and furniture business. "2. That the Buyer shall simultaneously with such delivery pay Sellers.. "(a) For the items covered by par. 1.(a) above - "(i) Actual cost to Sellers of said raw materials. "(ii) Attained cost to Sellers of said work in process. "(iii) 90 per cent of the Sellers' actual sales price of said finished inventory sold but not delivered by close of business October 11, 1950 (less Sellers' customary delivery cost). Buyer shall, upon his delivery thereof to the cutsomers, be entitled to collect the full price from them for his *202 own account. "(iv) 90 per cent of the Sellers' record sales price of said finished inventory unsold by said time (less Sellers' customary delivery cost). Sellers' 'record sales price' is either: the last price they actually charged, within the last 12 months, to any customer selected by them from among their five largest department store accounts, for the same item; or, if none, then the fair market value of said item. "(b) Buyer may reject (and not pay for) any item not shown to him before signing this Agreement; plus $15,000 in amount of other items. "(b) For the items covered by par. 1.(b) above - * * * [$27,500]. "(c) For the items covered by par. 1(c), (d), (e) above - One dollar ($1.00). "3. Chesterfield Furniture Shops, Inc. and Lycoming Chair Co. will permanently cease active business operations at the close of business October 11, 1950, and will thereafter act promptly to collect outstanding accounts and wind up. Sellers will at no time thereafter use, directly or indirectly, for any business purposes whatever, the name Chesterfield either alone or in combination with any other words. * * *
"9. The Buyer may assign this contract to any person, firm, or corporation, including *203 one to be formed in the future. * * *" From October 9 through October 12, a complete physical inventory of Charlotte and Lycoming was taken. As the inventory was counted, it was priced, calculated and typed out. The pricing was done according to the formula as set forth in the proposed sales agreement. The most recent invoice available was used in determining the seller's actual raw material cost, irrespective of when the item was purchased, and no deductions were made for obsolescence, physical condition, etc. If no invoice for a raw material item could be found, the price for it was determined on the spot by the seller and the buyer. The "attained cost" of work in process equaled its raw material and direct labor cost. On the evening of October 12, 1950, the buyer and seller met to sign the sales agreement, and execute a bill of sale. Just prior to the signing of the sales agreement, one of Charlotte's certified public accountants requested a change in item 2(c) and the buyer agreed. This change struck out the phrase "One dollar ($1.00)" and substituted the phrase "absorbed in inventory." The only other changes made in that portion of the proposed sales agreement set forth above *204 are found in item 3. These changed provisions then read as follows: "2. That the Buyer shall simultaneously with such delivery pay Sellers: * * *
"(c) For the items covered by par. 1(c), (d), (e) above - absorbed in inventory. "3. Upon the Buyer's making the aforesaid payments, then Chesterfield Furniture Shops, Inc. and Lycoming Chair Co. will permanently cease active business operations at the close of business October 11, 1950, and will thereafter for their own account proceed to collect their outstanding accounts and wind up. Sellers will at no time thereafter use, directly or indirectly, for any business purposes whatever, the name Chesterfield either alone or in combination with any other words." Thus modified, the sales agreement was then signed and a bill of sale for those assets set forth in the sales agreement was executed. The sales price was computed by adding to the agreed-upon $27,500 [7] figure for fixed assets the inventory figure as calculated under the sales agreement. Under date of October 12, 1950, Nathan Greenberg and the buyer entered into an employment contract under which Nathan Greenberg agreed *205 to work for the buyer as sales manager and general consultant. His compensation for the 1-year period covered by said employment contract, which only required 8 months of actual service, was $30,000. During the years 1949 and 1950, Nathan Greenberg, as president, and Nettie Greenberg, as secretary, had received $25,000 and $5,000, respectively, as annual salary from Charlotte. Also under date of October 12, 1950, Nettie Greenberg and the buyer entered into a lease for the premises in which Charlotte and Lycoming had conducted their operation. The lease was for the term commencing on October 12, 1950, and ending December 31, 1952, at an annual rental of $23,400. This lease also provided that it could be renewed for an additional 5-year period and contained an option allowing the buyer to purchase paid premises for $200,000. By an instrument dated October 11, 1950, the buyer assigned the above-mentioned sales contract, employment contract, and lease to a new corporation which was organized under the laws of the Common-wealth of Pennsylvania and known as Chesterfield Furniture Manufacturing Corporation, hereinafter referred to as Chesterfield. Chesterfield immediately commenced operating *206 Charlotte's and Lycoming's former business. Pursuant to the terms of the sales agreement, Chesterfield rejected $15,000 worth of merchandise from the inventory, and shortly thereafter purchased it for $7,500. The total purchase price paid for all the assets of Charlotte and Lycoming, including the initially rejected inventory, was $250,926.03. Proper allocation of this amount is $190,611.93 to Charlotte and $60,314.10 to Lycoming. The parties are agreed that $27,500 of the total purchase price is properly allocable to fixed assets; this is properly allocable $20,625 to Charlotte and $6,875 to Lycoming. In its 1950 income tax return Charlotte allocated its proceeds of the sale as follows: Fixed Assets
$ 20,625.00
Inventory
69,986.93
"Good Will"
100,000.00
Total
$190,611.93
Greenberg and Chesterfield agreed to terminate the above-mentioned employment contract on January 19, 1951. After that date, Chesterfield stopped selling to many of Charlotte's old customers and some of its employees left and others were laid off. Thereafter, Chesterfield's production decreased, and on June 30, 1952, it discontinued operations, sold its assets to Lewittes and Sons, [8] and made cash distributions in complete *207 liquidation to its stockholders, thus leaving itself unable to pay its tax liabilities. Chesterfield filed its Federal income tax returns for the fiscal year ending September 30, 1951, and for the period from October 1, 1951 to June 30, 1952, with the collector of internal revenue for the third district of New York and the director of internal revenue for Upper Manhattan in New York, respectively. On its books and for Federal income tax purposes, Chesterfield did not allocate any portion of the total amount it paid for all of Charlotte's assets to the good will it had purchased. At the time of the above liquidating distributions, the stockholders of Chesterfield were David Lewittes and his wife Charlotte, Morris Lewittes and his wife Fannie, Israel Lewittes and his wife Sarah, Joseph Meister, and Harold Strasser, all of whom were residents of New York. David Lewittes, Charlotte Lewittes, Morris Lewittes, Fannie Lewittes, Israel Lewittes and Sarah Lewittes each received a liquidating dividend of $5,236.24; Joseph Meister received a liquidating dividend of $2,681.13; and Harold Strasser received *208 a liquidating dividend of $1,570.87. These liquidating dividends were received by the stockholders in 1952 without consideration other than the surrender of their stock certificates. After acquiring Chesterfield's assets, Lewittes and Sons has used the trade name "Chesterfield" in its business, and such name remained in the phone book and building directory. Buyer and seller contracted for, and intended that, the sale here in question was for all the tangible and intangible assets of Charlotte and Lycoming as a going business. They also were aware of the fair market value of these assets and the total purchase price paid equaled their combined fair market value. The parties are agreed that Lycoming had and sold no good will. Chesterfield acquired Charlotte's good will, fixed assets and inventory at their fair market values of $55,000, $20,625, and $114,986.93, respectively. Opinion The principal issue is whether Chesterfield, hereinafter referred to as purchaser or buyer, purchased any intangible good will from Charlotte, and if so, what portion of the total purchase price is properly allocable to such good will. This issue is essentially one of fact and must be resolved on the basis *209 of the record before us. Thus, prior cases are of little value, except to the extent that they indicate the factors to be considered and the extent of such consideration. During the course of the trial, we heard the witnesses, observed their demeanor while testifying, and had the opportunity to form judgments at first hand with respect to their credibility and the weight to be given their testimony. We have found as facts that $190,611.93 of the total purchase price is allocable to Charlotte and that $20,625 of that amount represents payment for Charlotte's fixed assets at their fair market value. The parties seem to be in accord with these findings but each takes a different position as to the respective values of Charlotte's inventory and good will that were sold to and acquired by Chesterfield. The contentions of the parties are (round figures): Good Will
Inventory
Charlotte (Seller)
$100,000
$ 70,000
Respondent
51,000 [9]
119,000
Chesterfield (Buyer)
None
170,000
Good will has been well defined: Good will equals a - b, where "a" is capital-
ized earning power and "b" is the value of
assets used in the business. Good will, then, is
an intangible consisting of the excess earning
power of a business. A normal earning power
is expected of the business assets, and if the
business has greater earnings, then the business
may be said to have good will. This excess in
earning power may be due to any one or more
of several reasons, and usually this extra value
exists only because the business is a going con-
cern, being successful and profitable. Good will
may arise from: (1) the mere assembly of the
various elements of a business, workers, cus-
tomers, etc., (2) good reputation, customers'
buying habits, (3) list of customers and their
needs, (4) brand name, (5) secret processes,
and (6) other intangibles affecting earnings.
*210 George J. Staab, 20 T.C. 834, 840. There should be added to this definition the element of transferability expressed in Estate of A. Bluestein, 15 T.C. 770, 787, "the emphasis in valuation of good will should be placed on the relation between the tangible assets and profits but only to the extent that those profits would survive a change in the management of the business." Considering first the contention of the individual petitioners that Chesterfield did not purchase any good will from Charlotte, we note that the sales agreement expressly states, in paragraph 1(c), that one of the items purchased was the "good will of the frame and furniture business." In addition, the combination of all the assets purchased by Chesterfield constituted the total going business of Charlotte and Lycoming and that business was continued with no lapse of operations. Every element of that business was purchased by Chesterfield, and the record clearly indicates that David *211 Lewittes intended that Chesterfield acquire this going business in its entirety; any other conclusion would make meaningless the provisions of item 3 of the sales agreement that sellers cease operations and never thereafter use the name Chesterfield. If buyer truly sought only inventory, his actions were most unusual. Thus, we have found from the entire record that Chesterfield did in fact acquire the going business of Charlotte, including Charlotte's good will. John Q. Shunk, 10 T.C. 293, affd. on this issue 173 F. 2d 747, 750; Stratton Grocery Co., 8 B.T.A. 317, 323. It is not controlling that the sales agreement does not specifically allocate a portion of the total purchase price to good will, or that said price was derived through a contract formula, ostensibly based solely on tangible assets. Copperhead Coal Company v. Commissioner, 272 F.2d 45, affirming a Memorandum Opinion of this Court [17 TCM 30; T.C. Memo. 1954-64]; C. M. Hall Lamp Co. v. United States, 201 F. 2d 465. When construing a transaction for tax purposes, the form in which a contract is cast, or the use of a given formula for calculating the ultimate price, is but a factor that must be considered in the *212 light of the record as a whole. United Finance & Thrift Corporation of Tulsa, 31 T.C. 278, 286; Commissioner v. Court Holding Co., 324 U.S. 331, 334, affirming 2 T.C. 531. The give-and-take of bargaining determines the purchase price of the seller's good will, and this amount can be expressed in many ways. One method is to inflate the contract price of one or more tangible assets to a level that includes the agreed price of the good will, and it seems obvious that that is exactly what happened in this case when the buyer and seller changed the language of item 2(c) of the sales agreement from "One dollar ($1.00)" to "absorbed in inventory." The repeated insistence of buyer that this was a mere word change, signifying nothing, leaves us entirely unmoved. Our conclusion is strengthened by Greenberg's testimony that inventory items were worth about 45 cents on each $1 of valuation and by the fact that buyer bargained for and got the $15,000 of rejected inventory for $7,500. There are various mechanical formulae that purportedly calculate the value of good will. One such formula is found in A.R.M. 34, 2 C.B. 31, and it is used by both Charlotte and the respondent in support of their *213 respective positions. Under this formula, a selected percentage representing normal return is applied to the average of the owner's investment for a selected period of years. The resulting figure is then deducted from the average net earnings over the same period, and the excess earnings are attributed to the good will of the business. The value of the good will is then obtained by capitalizing said excess earnings at a selected percentage. The schedule below summarizes the data used by Charlotte and the respondent when they calculated the value of Charlotte's good will as of October 12, 1950, under A.R.M. 34: Charlotte
Respondent
Selected period of
years:
1946 through
1946 through
1950
1950
Average earnings for
period
$ 23,463.83
$ 23,463.83
Average of owner's
investment for pe-
riod
$112,444.57
$112,444.57
Selected normal re-
turn
8%
12%
Computed normal re-
turn
$ 8,995.57
$ 13,493.45
Difference between
average earnings
and normal return
on owner's invest-
ment
$ 14,468.26
$ 9,970.48
Selected rate of capi-
talization
15%
15%
Calculated value of
Charlotte's good
will on October 12,
1950
$ 96,455.07
$ 66,469.87
Since the record does not disclose sufficient credible evidence supporting the accuracy of the underlying figures *214 used in the above calculations, [10] they are of no substantial probative value. As we stated in John Q. Shunk, supra, at page 305: "The decided cases repeatedly point out that the use of formulae and the determination of the rates to be used constitute but one method of valuing good will and that all other existing factors of value must be taken into account. * * *" We are not here faced with a situation where the total fair market value of the tangible assets plus good will exceeds the total purchase price, as contended by the respondent. The seller and buyer were adverse, and acted at arm's length. Each was aware of the assets involved, and each knew the respective fair market values of those assets. The record clearly indicates that both *215 the seller and buyer were quite experienced in the business of manufacturing upholstered furniture and they were not of such disposition that they would accept less or pay more than the fair market value of all the assets involved. Therefore, we have found that the total purchase price of all the assets equaled their combined fair market value. In determining the value of the good will sold by Charlotte and purchased by Chesterfield we have considered, inter alia, that the prosperity of Charlotte was in part dependent upon the personal efforts and attributes of Nathan Greenberg. This must be considered, for it tends to limit the value of Charlotte's good will. D. K. MacDonald, 3 T.C. 720, 727. We have also considered the relationship between Charlotte and Lycoming. Both were sold as a unit; both were operated as a unit; both were owned by members of the same family; but both kept separate books and records. Charlotte bought frames only from Lycoming, and Lycoming sold only to Charlotte. Lycoming, according to its books and records, had a net loss totaling $7,809.67 for the years 1946 through 1949. Thus, it is possible that Charlotte's profits were, to some extent, inflated because *216 the price it paid for frames may have been artificially low. Although Charlotte did no advertising, some of its retailer-vendees did advertise the sale of furniture manufactured under the trade name "Chesterfield," and thereby created customer interest in that trade name. Furthermore, Charlotte usually sold to only one store in any given area, which protected that store's competitive position. Therefore, Charlotte's vendees had an interest in continuing to buy upholstered furniture under the trade name "Chesterfield," and that trade name did have substantial value at the time of its sale. In addition, these stores often sold furniture based on samples, and Chesterfield acquired a substantial source of future repeat business. The fact that about 90 per cent of Charlotte's sales were made to eight stores, two of which purchased 50 per cent of total out-put, does not indicate that Charlotte's good will was valueless, but it is one of the factors which we considered. We also considered the nature of the premises occupied by the business, location, labor supply, operating costs, competition and the general conditions of the upholstered furniture industry. Considering all pertinent factors *217 of record, we have found the value of the good will purchased by Chesterfield and sold by Charlotte to be $55,000. 2. The only issue remaining is whether the individual petitioners are liable as transferees for the tax liability of Chesterfield, and if so, to what extent. The burden of proof with respect to this issue is as provided by section 1119(a) of the Internal Revenue Code of 1939: "(a) Burden of Proof. - In proceedings before the Board the burden of proof shall be upon the Commissioner to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax." Our holding on the main issue makes it clear that Chesterfield did have unsatisfied tax liabilities at the time of the liquidating transfers here in issue and respondent has proved that the individual petitioners are its transferees, within the meaning of section 311 of the Internal Revenue Code of 1939, of cash in the following amounts: David Lewittes
$5,236.24
Charlotte Lewittes
5,236.24
Morris Lewittes
5,236.24
Fannie Lewittes
5,236.24
Joseph V. Meister
2,681.73 Each is therefore liable as a transferee of Chesterfield to that extent. Leon Papineau, 28 T.C. 54. Decisions *218 will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: David Lewittes, Docket No. 68666; Joseph V. Meister, Docket No. 68667; Fannie Lewittes, Docket No. 68668; Morris Lewittes, Docket No. 68669; and Charlotte Lewittes, Docket No. 68670.↩
2. As was stated by the respondent, on brief, "Through inadvertence, no notice of transferee liability was issued to Israel and Sarah Lewittes or Harold Strasser," who were the other stockholders of Chesterfield. ↩
3. $2,681.13 was received from Chesterfield. This discrepancy is unexplained.↩
4. The trade name "Chesterfield" had been used since 1918 by either Nathan Greenberg doing business as an individual proprietor or by some corporation in which he had an interest.↩
5. Charlotte's Federal income tax return for the year 1950 lists sales for that period of $716,719.87.↩
6. Adjustments to net income not exceeding $3,000 for the years 1946, 1948, and 1949 by respondent on audit are reflected.↩
7. All parties now agree to the $27,500 valuation for fixed assets.↩
8. This firm was owned by William, David, Morris and Israel Lewittes and their respective wives.↩
9. Respondent contends that the good will had a fair market value of $66,500 but that Chesterfield purchased inventory and good will at a bargain. The $51,000 figure is arrived at by pro-rata allocation between inventory and good will.↩
10. The amounts used as average earnings and average investment are hotly disputed by buyer (the third party to this litigation) and the record does disclose that Charlotte's auditors had, for a number of years, accepted Nathan Greenberg's "appraisal" of ending inventory without any verification. This alone casts grave doubt on the accuracy of the average earnings and average investment figures used and destroys the value of the formula computations.↩